**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**UNITED STATES OF AMERICA**,

        Plaintiff,

vs.                                                      Cr. No.07-1556 MCA

**JOHNNY BEGAY,**

        Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on Defendant Johnny Begay's *Motion to Suppress Defendant's Statements* [Doc. 25], filed February 6, 2008. The Court held a hearing on the motion on May 7, 2008. Having considered the parties' submissions, the relevant law, the arguments of counsel, and otherwise being fully advised in the premises, the Court denies the motion.

**I.**    **FINDINGS OF FACT**

    **The Initial Contact between the Defendant and Law Enforcement**

1.    Andrew D. Smith is a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), assigned to the FBI's Farmington, New Mexico field office.

2.    SA Smith has been employed by the FBI for approximately two years.

3.    SA Smith's duties involve investigating violent crime occurring on the Navajo reservation, including reports or allegations of sexual assault.

4.  In September of 2006, SA Smith was assigned to investigate allegations of sexual assault that had been made against the defendant, Johnny Begay, by two step-granddaughters.

5.  Early in his investigation, SA Smith attempted to make contact with Mr. Begay by traveling to Mr. Begay's home in November of 2006.

6.  After two unsuccessful attempts to make contact, SA Smith, on his third try, left his business card at Mr. Begay's home.

7.  SA Smith testified that his card

    > [reads] Andrew D. Smith, and then it just says "Special Agent with the Federal Bureau of Investigation," and it has my phone number and address for the office, and I just wrote on the back, "Please contact me as soon as possible."

8.  SA Smith left his card between the door and the doorjamb at Mr. Begay's house.

9.  SA Smith testified that "a few days" after he left his card, Mr. Begay came to the Farmington field office.

10. The credible suppression-hearing testimony revealed that Mr. Begay came to the FBI field office on November 16, 2006.

11. SA Smith testified that he was not expecting Mr. Begay on any particular date or at any particular time.

12. According to SA Smith, Mr. Begay arrived at the field office unaccompanied. Mr. Begay entered the lobby, where a secretary asked if she could help him. Mr. Begay stated that "he needed to speak to" SA Smith, who then came into the lobby and

introduced himself.

13. I find SA Smith's testimony credible in this regard.

14. Additionally, given that SA Smith and Mr. Begay had no pre-arranged meeting time I it is reasonable to infer that Mr. Begay himself made the decision as to when and how to contact SA Smith.

15. SA Smith and the secretary were the only individuals, other than Mr. Begay, at the Farmington field office at the time of Mr. Begay's arrival. No other law enforcement officers were present.

16. SA Smith escorted Mr. Begay from the lobby into an interview room.

## The Circumstances Surrounding SA Smith's Interview of Mr. Begay and the Men's Demeanor

17. The interview room into which SA Smith brought Mr. Begay measures approximately ten feet by eight feet. It contains a table surrounded by four chairs, two on each long side of the table. Two doors lead into the room. There is a telephone on the table. There is a metal detector in the room. The room is windowless. [Exhibit 1-8].

18. SA Smith and Mr. Begay sat at the table, across from each other.

19. Only SA Smith and Mr. Begay were in the interview room.

20. Mr. Begay sat in a chair that was situated approximately two feet from the interview room's exit and approximately five to seven feet from the building's exit.

21. I find that Mr. Begay was not handcuffed or restrained.

22. Once in the interview room, SA Smith began asking Mr. Begay questions relating to

his investigation.

23. Although there is a metal detector in the room, SA Smith did not have Mr. Begay pass through it because he saw no reason to have Mr. Begay do so. In SA Smith's words, Mr. Begay "seemed like a reasonable gentleman that was coming in on his own accord to speak with me."

24. During the interview, both doors to the interview room were closed. SA Smith credibly testified that the doors were closed for purposes of privacy and safety.

25. SA Smith testified that there is a difference between an interview and an interrogation, with the former being "more of a conversation" and the latter "turn[ing] to accusations."

26. According to SA Smith, his purpose for meeting with Mr. Begay was not to take him into custody but, rather, "to sit down and interview him and get his side of the story."

27. SA Smith further testified:

> I generally tried to take an open approach, tried to make Mr. Begay comfortable. I have found in doing interviews that if you make someone comfortable they open up and tell their side of the story more comfortably, and that's all I was trying to do that day, is get his side of the story.

28. SA Smith also testified that he tries to maintain a rapport with the interviewee because he is more likely to get accurate information that way. For that reason, he did not get loud, aggressive, or intimidating during the interview.

29. I find SA Smith's testimony credible in this regard.

30. It is undisputed that SA Smith did not advise Mr. Begay of his rights under <u>Miranda</u>

v. Arizona, 384 U.S. 436 (1966) before beginning the interview. He explained:

> I did not feel that [a Miranda warning] was necessary. I was not taking Mr. Begay into custody that day. I had no intention of taking him into custody that day. I just wanted to sit down and interview him and get his side of the story. So I did not feel it was necessary to do so. Mr. Begay was free to leave at any moment.

31. I find and accept as credible SA Smith's representation that he did not intend to take Mr. Begay into custody on the day of the interview.

32. I also find, however, that SA Smith did not tell Mr. Begay either that he was not under arrest or that he was free to leave at any time.

33. SA Smith does not wear any sort of uniform; instead, he testified that he normally dresses in khaki pants and a collared shirt and that he was so dressed on the day of his interview with Mr. Begay.

34. SA Smith carries a weapon, which he keeps in a holster that is snapped to the left side of his belt, next to his badge.

35. SA Smith testified that during his interview with Mr. Begay, he never drew or pointed his weapon, nor did he grasp it while it was in its holster.

36. I find and accept as credible SA Smith's testimony in this regard.

37. SA Smith's interview of Mr. Begay lasted approximately 20 minutes.

38. During the interview, Mr. Begay asked for no breaks and SA Smith offered none.

39. SA Smith testified that he typically does not offer breaks unless he is conducting a "particularly long" interview, which he described as an interview lasting more than

one hour.

40. I find and accept as credible SA Smith's testimony in this regard.

41. SA Smith described Mr. Begay as nervous, but also "quite calm" during the interview.

42. According to SA Smith, Mr. Begay "wasn't extremely emotional about anything during the interview."

43. SA Smith described Mr. Begay as having a flat affect during the interview.

44. SA Smith further testified that Mr. Begay willingly and voluntarily responded to the questions posed.

45. I find and accept as credible SA Smith's testimony in this regard. I further find that, given the credible descriptions of the demeanor of both SA Smith and Mr. Begay, a calm and conversational tone existed throughout the course of the interview.

### SA Smith's Questions to Mr. Begay and Mr. Begay's Statements to SA Smith

46. Without first Mirandizing Mr. Begay, SA Smith asked Mr. Begay why the children would accuse him of having touched them in an inappropriate manner.

47. SA Smith then asked Mr. Begay if he was aware that his step-daughter also had alleged that Mr. Begay had touched her inappropriately when she was a child.

48. According to SA Smith, Mr. Begay responded that he was aware of the accusation by his step-daughter, but did not know why she or the children would make such accusations.

49. Mr. Begay suggested that the children might have misunderstood his actions in entering their room late at night to close curtains or turn off the television.

50. In response to SA Smith's inquiry as to whether the children might have misconstrued a spanking, for example, Mr. Begay responded that he never spanked the girls; he only hugged them.

51. The reason SA Smith asked Mr. Begay why the children (as well as their mother) would accuse him of having touched them inappropriately and whether the children could have misconstrued some action on Mr. Begay's part was to get an explanation and to hear Mr. Begay's "side of the story." In SA Smith's words, he "was trying to give [Mr. Begay] an out, a reason for why these things may have occurred or why a misunderstanding might have occurred with the young children."

52. During the course of the November 16, 2006 interview, SA Smith was taking notes, which he dictated into a report 13 days later, on November 29, 2006.

53. SA Smith's notes, and in turn his report, reflect direct quotes from Mr. Begay as well as paraphrasings of statements Mr. Begay made.

54. According to SA Smith, when he asked whether the actions alleged actually occurred, Mr. Begay responded, "I'm not defending that. Who is going to believe me?"

55. SA Smith did not ask Mr. Begay to clarify what he meant by this because SA Smith interpreted the statement as meaning that, in a he-said-she-said situation, Mr. Begay felt unlikely to be believed.

56. SA Smith also testified that Mr. Begay denied having had inappropriate contact with his step-grandchildren.

57. Thus, SA Smith did not interpret the statement, "I'm not defending that. Who is

going to believe me?" as a confession.

58. When SA Smith told Mr. Begay that "a young girl usually doesn't make these things up," Mr. Begay responded that maybe the children did not understand his entering their room to turn off the television and/or close the windows and drapes, a response that SA Smith testified he did not understand.

59. SA Smith then asked Mr. Begay what he thought should happen to someone who touched his step-grandchildren.

60. SA Smith testified that he asked this question in order to see Mr. Begay's reaction, since, in SA Smith's experience, innocent people will normally become angry and express a desire to see the perpetrator punished.

61. Mr. Begay responded, "I don't know . . . it's up to the law."

62. According to SA Smith, Mr. Begay did not "get too emotional one way or another."

63. However, SA Smith took the statement, "I don't know . . . it's up to the law" to be "pretty ambiguous."

64. When SA Smith told Mr. Begay that if he were involved in touching the children he could be in trouble, Mr. Begay responded by saying that he understood the law.

65. I find that Mr. Begay gave a number of responses that SA Smith found to be ambiguous, and that SA Smith's continued questioning in the face of those responses does not indicate disbelief on SA Smith's part but, instead, an ongoing attempt to understand what, if anything, had happened between Mr. Begay and his step-grandchildren that could be deemed inappropriate.

66. Mr. Begay is Navajo and speaks Navajo.

67. SA Smith conducted the interview in English.

68. SA Smith testified that, while Mr. Begay "wasn't always grammatically correct[, h]e seemed very comfortable with English."

69. SA Smith also testified that Mr. Begay seemed to understand everything he was asked, responding in English.

70. There appeared to SA Smith no need to call a Navajo interpreter, since neither he nor Mr. Begay was struggling to understand the other.

71. In SA Smith's words, he and Mr. Begay "were having a conversation. I would ask him a question and he would respond. . . ."

72. I find that Mr. Begay understood the questions SA Smith was asking him during the interview.

73. After the interview concluded, SA Smith shook Mr. Begay's hand and Mr. Begay left the FBI field office.

74. SA Smith subsequently obtained a warrant for Mr. Begay's arrest; Mr. Begay was arrested August 1, 2007, having been indicted July 25, 2007 on one count of the aggravated sexual abuse of a child, 18 U.S.C. §§ 1153, 2241(c), and 2246(3). [See Doc. 2].

## II.  LEGAL ANALYSIS AND CONCLUSIONS OF LAW

Mr. Begay has moved to suppress all statements he made to SA Smith on November 16, 2006 on the ground that, at the time of the interview, he had not been advised of his rights

under <u>Miranda v. Arizona</u>. [Doc. 25 at 1]. Specifically, Mr. Begay contends that

> [his] first language is Navajo. He speaks English but is more comfortable in the Navajo language. Throughout his interrogation Mr. Begay was confused by law enforcement's words. During the interrogation, it was made clear to Mr. Begay that law enforcement did not believe him. He was pressured to explain why the children would lie. Mr. Begay is not sophisticated. It is often necessary for Mr. Begay to have non-Indian concepts explained to him more than once in the English language. He is very traditional.

[<u>Id.</u> at 1-2]. The Government responds that SA Smith was not required to advise Mr. Begay of his <u>Miranda</u> rights because he was not "in custody" at the time he was questioned. [Doc. 28 at 4-5]. For purposes of his suppression motion, Mr. Begay bears the burden of proof. <u>See</u> <u>United States v. Madrid</u>, 30 F.3d 1269, 1275 (10th Cir. 1994) ("The proponent of a motion to suppress bears the burden of proof.").

In <u>Miranda</u>, the United States Supreme Court explained that "without proper safeguards[,] the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." <u>Miranda</u>, 384 U.S. at 467. To guard against that danger, "the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." <u>Id.</u> "[T]he <u>Miranda</u> rule creates a presumption of coercion, in the absence of specific warnings, that is generally irrebuttable for purposes of the prosecution's case in chief. <u>United States v. Patane</u>, 542 U.S. 630, 639 (2004). Thus, any statement, inculpatory or exculpatory, obtained during a "custodial interrogation" may not be used by the prosecution

against the defendant unless the prosecution demonstrates the use of procedural safeguards effective to secure the Fifth Amendment privilege against self-incrimination. Miranda, 384 U.S. at 444.

Because Miranda, "on its own terms," applies only to custodial interrogations, law enforcement officers are not required to administer Miranda warnings to everyone they question. United States v. Jones, No. 07-4141, 2008 WL 1812886, at *3 (10th Cir. Apr. 23, 2008). Instead, "Miranda rights need only be given to a suspect at the moment that suspect is 'in custody' and the questioning meets the legal definition of 'interrogation.'" United States v. Chee, 514 F.3d 1106, 1112 (10th Cir. 2008). "Although the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving of Miranda protection, the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983). The term "in custody" is so defined because of

> the very practical recognition that "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime."

Id. (*quoting* Oregon v. Mathiason, 429 U.S. 492, 495 (1977)).

Whether an individual is in custody for purposes of Miranda must be determined by reference to what a reasonable person would have believed. See Berkemer v. McCarty, 468 U.S. 420, 442 (1984) ("[T]he only relevant inquiry is how a reasonable man in the suspect's

11

position would have understood his situation."). This objective standard frees questioning officers from "the burden of anticipating the frailties or idiosyncracies of every person whom they question." Id. n.35. Thus, the relevant question is whether a reasonable person in the suspect's position would have understood the situation as the functional equivalent of formal arrest. Jones, 2008 WL 18129886, at *4 (internal quotations omitted).

"The determination of custody, from an examination of the totality of the circumstances, is necessarily fact intensive." United States v. Griffin, 7 F.3d 1512, 1518 (10th Cir. 1993). In making the determination, the Court "avoid[s] hard line rules and instead allow[s] several non-exhaustive factors to guide" it. Jones, 2008 WL 18129886, at *4. In Jones, the Tenth Circuit set forth the following factors as among those to be considered:

> (1) the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will;
>
> (2) the nature of questioning, where prolonged accusatory questioning is likely to create a coercive environment from which an individual would not feel free to leave; and
>
> (3) whether police dominate the encounter.

Id. In assessing the third Jones factor—whether police dominate the encounter—the Court may consider the following:

> (a) a separation of the suspect from family or colleagues who could offer moral support;
>
> (b) isolation in nonpublic questioning rooms;
>
> (c) the threatening presence of several officers;

12

        (d) a display of a weapon by an officer;

        (e) physical contact with the subject; and

        (f) an officer's use of language or tone of voice in a manner implying that compliance with the request might be compelled.

Id. With the foregoing in mind, I turn now to the initial question of whether Mr. Begay was "in custody" at the time of his interview with SA Smith.

### A. Mr. Begay's Freedom to Leave

I find that the strongest factor weighing in Mr. Begay's favor is the fact that SA Smith never informed Mr. Begay that he was free to terminate the interview and leave the field office. SA Smith admitted as much at the suppression hearing when he explained that, although Mr. Begay was free to leave, he did not "directly [say] that to him during the interview." Additionally, the interview was conducted in a small (approximately ten feet by eight feet) windowless room, both doors to which were closed. Finally, while SA Smith may have had no intention of taking Mr. Begay into custody that day, the relevant inquiry focuses not on SA Smith's intent but, instead, on whether a reasonable person in Mr. Begay's position would have understood the situation to be the functional equivalent of formal arrest.

"That a person is told repeatedly that he is free to terminate an interview is powerful evidence that a reasonable person would have understood that he was free to terminate the interview." United States v. Czichray, 378 F.3d 822, 826 (8th Cir.2004). For example, in United States v. Chee, the sole suspect in a case of aggravated sexual abuse arrived at the Blanding, Utah Police Department in response to a card left with his daughter by an FBI

13

Special Agent who informed the daughter that he wished to speak to her father about a firearm the suspect/father had found in his car. The suspect came to the department with his wife, where he was met by the FBI Special Agent and a criminal investigator. The suspect, the special agent, and the criminal investigator entered an office (as opposed to a formal interview room) while the wife waited outside. The three men were the only individuals in the office. The door was closed during the interview, but the agents (1) were in plain clothes; (2) displayed no weapons or handcuffs; and (3) did not restrain the suspect. Chee, 514 F.3d at 1110-11.

The special agent "began the conversation by telling [the suspect] that he was not under arrest, he was not in any trouble, he could leave if he wanted, and he did not have to talk." Chee, 514 F.3d at 1111. The conversation, which began with questioning about the firearm, ultimately turned to questions about the alleged sexual assault. After the special agent informed the suspect that the police had obtained DNA evidence from the scene when, in fact, the agent knew that was not the case, the suspect admitted to having had sex with the victim against her will. Id.

The suspect unsuccessfully moved to suppress his confession on the ground that it was obtained in violation of Miranda. Affirming the district court's denial of the suppression motion, the Tenth Circuit declared "[h]elpful to [its] analysis" that the suspect was made aware that he was free to refrain from answering questions and to end the interview at will, but this fact was not dispositive. Chee, 514 F.3d at 1113. Also relevant to the conclusion that the suspect was not "in custody" for Miranda purposes were that (1) the interview lasted

less than an hour; (2) the tone of the interview remained calm and conversational; and (3) the suspect left once the interview concluded. Id. at 1114.[1] Thus, while the Tenth Circuit cautions against underestimating the importance of a suspect's being told that he is not under arrest and is free to refrain from answering questions and to leave the interview, see Jones, 2008 WL 1812886, at *5,[2] it is still just one factor in the "totality of the circumstances" analysis.

### B. The Nature of the Questioning

The next factor I consider is the nature of the questioning, specifically whether there existed any "prolonged accusatory questioning . . . likely to create a coercive environment from which an individual would not feel free to leave." Jones, 2008 WL 1812886, at *4.

As an initial matter, I note that the credible suppression-hearing testimony in this case

---

[1] Although the Tenth Circuit did not expressly address the fact that the suspect in Chee voluntarily came to the police department in response to the card left with his daughter, it noted the "very similar factual situation in Oregon v. Mathiason," where, among other things, a burglary suspect arrived at a state patrol office in response to a card left at his home by the investigating officer. The card was left with a note for the suspect to call the officer to "discuss something." Mathiason, 429 U.S. at 493. The suspect's voluntary arrival was considered for purposes of the "in custody" determination:

> He came voluntarily to the police station, where he was immediately informed that he was not under arrest. At the close of a 1/2-hour interview respondent did in fact leave the police station without hindrance. It is clear from these facts that [the defendant] was not in custody 'or otherwise deprived of his freedom of action in any significant way.'

Id. at 495.

[2] Noting that Tenth Circuit "cases. . . establish the importance of telling suspects they are not under arrest and can terminate the encounter at will."

revealed that SA Smith's interview of Mr. Begay lasted approximately 20 minutes. Interviews lasting less than an hour have weighed against findings that the suspects were "in custody" in both Mathiason and Chee.  See Mathiason, 429 U.S. at 495; Chee, 514 F.3d at 1114.

Although counsel for Mr. Begay maintains that "[d]uring the interrogation, it was made clear to Mr. Begay that law enforcement did not believe him [and that h]e was pressured to explain why the children would lie[,]" [Doc. 25 at 2], the credible evidence simply does not support this contention.  To the contrary, SA Smith credibly testified that in repeatedly asking why Mr. Begay's step-grandchildren (as well as their mother) would accuse him of having touched them inappropriately, SA Smith "was trying to give him an out, a reason for why these things may have occurred or why a misunderstanding might have occurred with the young children."  SA Smith also described some of Mr. Begay's responses as ambiguous and vague.  In the absence of evidence to the contrary, it is reasonable to infer that SA Smith's continued questioning in the face of the responses he was receiving shows an ongoing attempt to understand what, if anything, had happened between Mr. Begay and his step-grandchildren that could be deemed inappropriate, rather than doubt or skepticism as to what Mr. Begay was telling him.

The credible suppression-hearing testimony also points away from a finding that the interview was conducted in a coercive environment.  Although SA Smith described Mr. Begay as appearing nervous, the Tenth Circuit has, on more than one occasion, warned against reading too much into a suspect's nervous demeanor.  See, e.g., United States v.

Fernandez, 18 F.3d 874, 879 (10th Cir. 1994) (commenting on repeated Tenth Circuit holdings that nervousness is of limited significance in determining reasonable suspicion to search, and calling "common knowledge" the fact that most people—innocent or guilty—are likely to exhibit some signs of nervousness when confronted by a law enforcement officer asking potentially incriminating questions); United States v. Hall, 978 F.2d 616, 621 n.4 (10th Cir. 1992) ("While a person's nervous behavior may be relevant, we are wary of the objective suspicion supplied by generic claims that a Defendant was nervous or exhibited nervous behavior after being confronted by law enforcement officials. . . ."). SA Smith also described Mr. Begay as (1) "quite calm;" (2) not "extremely emotional about anything in the interview;" and (3) having a sort of flat affect.

    In describing himself, SA Smith testified that, in general, he tries "to take an open approach" with his interviewee and, in this particular case, "tried to make Mr. Begay comfortable [because] if you make someone comfortable they open up and tell their side of the story. . . ." SA Smith also testified that he endeavors to maintain a rapport with his interviewee because he is more likely to get accurate information that way. SA Smith's testimony that he was not loud, aggressive, or intimidating with Mr. Begay was uncontroverted. SA Smith described the interview as "more of a conversation," as opposed to an accusatory interrogation. Given the credible testimony adduced at the suppression hearing, I cannot find that Mr. Begay has demonstrated that his interview with SA Smith was marked by "prolonged accusatory questioning" likely to create a coercive environment from which individual would not feel free to leave.

**C. Whether Police Dominated the Encounter**

I find the police-domination factor to be the weakest factor in the "in custody" calculus. As previously explained, Mr. Begay came to the FBI field office in response to a card left at his home by SA Smith, asking him to make contact. SA Smith was not expecting Mr. Begay on any particular day or at any particular time, suggesting that Mr. Begay was the one who decided when to make contact with SA Smith, as well as the manner by which to do so (*e.g.*, to walk in or make a telephone call).

Mr. Begay came to the FBI field office unaccompanied, announced himself to the secretary, and then proceeded into a nonpublic interview room with SA Smith. "Interviews taking place on [a law enforcement officer's] 'home turf' are more likely to be police-dominated." United States v. Ollie, 442 F.3d 1135, 1139 (8th Cir. 2006). However, the mere fact that questioning takes place in such a setting does not, in and of itself, transform an interview into a custodial interrogation. See Chee, 514 F.3d at 1114 ("[T]he mere fact that Mr. Chee was questioned by himself in a nonpublic office at the police department after his wife was asked to remain outside does not transform this interview into a custodial interrogation."). Other factors to consider include the duration of the interview (here, approximately 20 minutes) and that, at the conclusion of the interview, the suspect, having been told he is free to leave, does so. See id.

Additional factors militating against a finding that the interview in this case include that, on the day of the interview, SA Smith was dressed in plain clothes (khaki pants and a collared shirt). He carried a weapon, but the weapon remained holstered throughout. SA

18

Smith credibly testified that during the interview, he never drew or pointed his weapon, nor did he grasp it while it was in its holster. Mr. Begay was not handcuffed or otherwise restrained, nor was he made to pass through the room's metal detector. SA Smith was the only FBI agent in the interview with Mr. Begay and credibly testified that he made an effort to keep a comfortable rapport, rather than make an intimidating show, so as to obtain accurate information from Mr. Begay. There is no allegation that SA Smith raised his voice at Mr. Begay, or that he made physical contact. Finally, the fact that once the interview concluded Mr. Begay freely left the field office serves "as strong evidence" that Mr. Begay was not in custody at the time of his interview. See Jones, 2008 WL 1812886 at *8 (noting that "the Supreme Court and the lower courts have relied upon the fact that the suspect was allowed to leave following the interrogation as strong evidence that the interrogation was not custodial"). All in all, I cannot find that police domination existed here.

### III.  CONCLUSION

Although Miranda exists to safeguard an accused against the "inherently compelling pressures which work to undermine [his] will to resist and to compel him to speak where he would not otherwise do so freely[,]" Miranda, 384 U.S. at 467, Miranda does not become applicable for a suspect *not* subjected to custodial interrogation. In this case, the totality of the circumstances surrounding SA Smith's interview of Mr. Begay falls short of demonstrating that Mr. Begay was "in custody" for purposes of Miranda at the time he was questioned. Mr. Begay simply has not shown that a reasonable person in his position would have felt his liberty was restricted to a degree associated with formal arrest. For that reason,

and on the basis of the findings and conclusions set forth more fully in the body of this *Opinion*, Mr. Begay's motion to suppress his statements is denied.

**IT IS, THEREFORE, ORDERED** that Defendant Johnny Begay's *Motion to Suppress Defendant's Statements* [Doc. 25] is **DENIED**.

**SO ORDERED** this 27th day of June, 2008, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
United States District Judge